UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

KIMBERLY SMITH,

      Plaintiff,

  v.

EXXON MOBIL CORP.,
INDEPENDENT OIL WORKERS AT
PAULSBORO, NEW JERSEY, and
JOHN DOES 1-20,

      Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 02-4425 (JEI)

**OPINION**

**APPEARANCES:**
GRUCCIO, PEPPER, DE SANTO & RUTH, P.A.
By: WILLIAM G. BLANEY, ESQ.
817 Landis Avenue
P.O. Box 1501
Vineland, NJ 08362-1501
(856) 691-0100
    Attorneys for Plaintiff

McCUSKER, ANSELMI, ROSEN, CARVELLI & WALSH
By: JOHN B. McCUSKER, ESQ.
    JOSEPH T. WALSH, III, ESQ.
127 Main Street
Chatham, NJ 07928
(973) 635-6300
    Attorneys for Defendant Exxon Mobil Corp.

MARKOWITZ & RICHMAN
By: R. MATTHEW PETTIGREW, JR., ESQ.
121 South Broad Street
Suite 1100
Philadelphia, PA 19107
(215) 875-3100
    Attorneys for Defendant Independent Oil Workers

**IRENAS**,  Senior District Judge:

    Presently before this Court is Defendant Exxon Mobil

Corporation's Motion for Summary Judgment.[1]  Since Plaintiff's claim for negligent infliction of emotional distress is precluded by New Jersey workman's compensation law, summary judgement will be granted as to Count IV of the Complaint.  As to Plaintiff's remaining claims, she has raised a material dispute of fact regarding the conduct of Exxon Mobil employees and management, and so summary judgement will be denied.

I.

A.

Plaintiff Kimberly Smith ("Smith" or "Plaintiff") was employed by Defendant Exxon Mobil Corporation ("Exxon Mobil") from June 1997, until she was fired on December 19, 2001.  She worked as a Package Operator at the Gloucester County Plant (hereinafter the "Plant").  Plaintiff was a member of the bargaining unit that was represented, for collective bargaining and grievance purposes, by Defendant Independent Oil Workers at Paulsboro, New Jersey (the "Union").

On August 8, 2002, Plaintiff brought an action in the Superior Court of New Jersey against Defendants pursuant to New Jersey's Law Against Discrimination (hereinafter "LAD") for claims relating to discrimination and retaliation.  Related to

---

[1] Defendant Independent Oil Workers' Motion for Summary Judgment is currently pending before this Court.

her claims for discrimination and retaliation are her claims for negligent infliction of emotional distress and intentional infliction of emotional distress.  The Complaint also alleges breach of contract claims and breach of duty to fair representation (against the Union).  On September 11, 2002, Exxon Mobil removed this matter to United States District Court for the District of New Jersey, Camden Vicinage.[2]

### B.

Of the approximately ninety employees at the Plant, only five or six are women.  Smith portrays the Plant's working environment as generally unfriendly to women and specifically cites instances where she was singled out.  Smith also alleges that the responses from management were inadequate.  She claims that not only are women harassed based on their sex, but are also retaliated against for any complaints brought to management. Smith details a number of instances which she claims constitute violations of the LAD.

Plaintiff alleges that she was ridiculed and harassed because she is a female and a single mother.  She also claims that her treatment stemmed in part from the fact that she had

---

[2] The case was removed pursuant to 28 U.S.C. § 1331.  Exxon Mobil contended that Count V of the Complaint was based in federal law, as it revolved around violations of a collective bargaining agreement and the duty of fair representation which fall under the purview of the Labor Management Relations Act, 29 U.S.C. § 185. The Union consented to Exxon Mobil's removal.

3

previously dated two male employees at the Plant and had refused attempts by other co-workers to engage in romantic and/or sexual relationships.

She claims that employees would use foul and demeaning names of a sexual nature to refer to her, such as "slut," "cunt," "bitch," "trailer park Barbie," "trailer park trash" and "rail yard tooter[3]."[4]   The alleged harassment also included other employees questioning the ancestry of Smith's children.  Smith asserts that other employees would make comments about her physical attributes to her co-workers such as "nice ass" and "great looking boobs."  They also indicated how they "can't wait to get her" (in a sexual context).  Smith argues that even supervisors would make sexist comments, indicating that Smith had obtained her job only because she batted her eyes at someone.

Smith complains that pornography was left in areas where she was forced to view it on a regular and continuing basis.[5]  Although management would eventually dispose of the materials, she claims that they greeted her concerns with laughter or

---

[3] The name "rail yard tooter" was given to Plaintiff to imply that she would meet a male co-worker in the rail yard of the Plant and perform oral sex on him.

[4] Smith admits that she did not alert Plant management when she heard a co-worker refer to her as "trailer park Barbie."  She also admits that some of the other names were not heard by her directly, but rather she heard from someone else that people called her those names.

[5] Smith's accusations are corroborated by the deposition testimony of co-worker Clark Jordan.  (Jordan Dep., at pp. 45-50.)

ambivalence and did not institute a proper investigation.[6]   (Pl. & Def. Statements of Fact, ¶¶ 24-31.)

Over the course of a few weeks in June, 2001, the alleged disparaging treatment of Plaintiff became more direct.  A prominently displayed calender featuring Norman Rockwell portraits and detailing work related matters was twice defaced in a manner degrading to Plaintiff.  The calender featured a picture entitled "The Babysitter" for the month of February.  It depicted a young woman with a crying baby in her arms.  A co-worker wrote "Kim" on the woman's body and the name of a male co-worker on the woman's arm.  Plaintiff took these references to indicate that the co-worker was mocking her as a woman with child care responsibilities and was insinuating that she had some sort of relationship with the named male co-worker.  The illustration for the month of June was called "The Shiner" and featured a young woman with a black eye sitting outside the school principal's office, waiting to be disciplined.  A co-worker wrote Plaintiff's name on the woman's chest and the name of the two male co-workers she had previously dated on each arm, simulating tattoos.  When Plaintiff viewed the calender, she scribbled out her name and wrote "leave me alone."  Thereafter, a co-worker wrote back "love

---

[6] Exxon points out that Smith never tried to pursue a complaint further than reporting the presence of pornographic materials to her shift supervisor.

you."[7]

Plaintiff responded by complaining to management, specifically her shift supervisor Michael Spellman (who passed her complaint on to the Plant Operations Manager Craig Turck). On June 22, 2001, Plaintiff met with Turck and her Union representative, George Wagner,[8] to discuss her complaint.

Following this meeting, Exxon Mobil asserts that it acted quickly by advising Plant manager John Thomas as to the situation; interviewing Plaintiff with Union representative George Wagner; interviewing employees, specifically those who were implicated by Plaintiff; immediately posting Exxon Mobil's harassment policy; and, requesting shift supervisors to review the policy in meetings at the beginning of each shift. (Mot. Summ. J., at p.9.)

Plaintiff, however, suggests that the Exxon Mobil posted a "reminder" of the Policy, and not a detailed letter as it purports in its moving papers to have done.  Smith also states that all supervisors did not review the Policy with the staff at the beginning of each shift; she cites to the deposition testimony of Gainer, in which he notes that he did not recall

---

[7] Exxon claims that the markings on the calender were "absolutely gender-neutral" and did not constitute sexual harassment.  (Mot. for Summ. J., p. 9.)  Initially, Smith's complaints were treated as a generic "harassment" complaint, and not necessarily a "sexual harassment" complaint.

[8] A portion of Smith's allegations go to the statements allegedly made by Wagner, which include calling Smith a "bitch" or "cunt." (Pl. Statement of Facts, ¶ 22.)  Wagner admits to calling Smith a "bitch" on at least two occasions; he clams that his comments were made in reference to her poor attendance.  (Wagner Dep., at pp. 56-57; 60-61.)

receiving instructions to review the Policy at the beginning of each shift.  (Pl. Statement of Fact, ¶ 17.)

Following management's investigation of the calender mark-up, Smith claims she was greeted with teasing which she thought indicated that Plant employees were aware of her sexual harassment complaint.  Employees mocked her by telling her that they better not talk to her for fear of having a sexual harassment complaint filed.  According to Smith, they also repeated information that Plaintiff had only shared with Turck and Wagner in their meeting.

Plaintiff became upset believing that her co-workers may know the content of her meeting with management and she met with Turck and Wagner again on June 26, 2001, to express her concerns.[9]  Turck and Wagner demanded to know the names of those who had teased her about the June 22, 2001 meeting.  When Plaintiff refused to provide these names for fear of further retaliation, Turck and Wagner set up another meeting later that day with Plant Manager Thomas.

At her meeting with Turck, Wagner and Thomas, Smith appeared mentally and physically unable to return to work.  She was escorted by Turck to the Plant's in-house physician, Dr. Williams, who concluded that she could not return to work and

---

[9] Sometime during the day on June 26, 2001, a conversation Smith had with Gainer was reported to Turck. Smith had complained to Gainer that Wagner had inappropriately touched her and said "I don't see any tattoos" (referring to the defaced calender picture).  (Turck Meeting Notes, Mot. for Summ. J., Ex. M.)

that she should see a psychologist.  Plaintiff was further
advised that she would speak with Peter McAllister
("McAllister"), a Human Resource representative of Exxon Mobil
from outside the Plant.

On the morning of June 27, 2001, Plaintiff arrived at 9:00
am for her meeting with McAllister and was placed alone in a
conference room.  At 1:00 pm, McAllister arrived.  Plaintiff
informed him that she believed Turck and Thomas had made her wait
four hours in an effort to retaliate against her for complaining
about sexual harassment.  According to Smith, McAllister
responded by saying "I think they are."[10]  At some point during
their meeting, Smith complained to McAllister about Wagner,
although the scope of her complaint (i.e. whether it revolved
around Smith's lack of trust in Wagner as her Union
representative to advocate zealously or whether it also included
complaints about derogatory and/or sexual comments Wagner
allegedly made in reference to Smith) is in dispute.  (Statement
of Facts, ¶ 21.)

Shortly after, Plaintiff met with Samuel Babcock, Ph.D., the
psychologist recommended by Dr. Williams.  According to
Plaintiff, Dr. Williams labeled Plaintiff as unable to work based

_____

[10] McAllister did not recall discussing this with Smith. (McAllister Dep., at pp. 39-41.)  He testified that someone from the Plant management would have set up the meeting time; when he travels he normally will not arrive to the Plant until around ten o'clock.  (*Id.*)

on Dr. Babcock's evaluation.[11]

While Plaintiff was out on medical leave, Turck, Thomas, McAllister and Charnisky began an investigation into aspects of Plaintiff's claims of harassment and the compensable nature of her stress leave under Worker's Compensation.[12]  Turck interviewed two male co-workers Plaintiff suspected of being responsible for the writing on the calender, as well as other employees on other shifts.  When no evidence resulted, Turck stated that he posted a letter explaining Exxon Mobil's anti-harassment policy and concluded his investigation.

C.

Thomas requested that Turck put together a compilation of Plaintiff's employment history from the prior four years.  This document included a time line with specific references to her days off, her complaints of sexual harassment and several other disciplinary infractions.  Turck forwarded these materials to Thomas, McAllister and Charnisky.  In addition, he enlisted other

---

[11] Dr. Babcock stated at his deposition that after his initial meeting with Smith, he wrote Dr. Williams and indicated a tentative diagnosis of dysthemic disorder (which in the past was generally referred to as neurotic depression).  Dr. Babcock thought after the first visit that certain depression was work-related, and some personal issues also played a role in her depression and anxiety.  (Dep. of Dr. Babcock, at pp.18-19.)

In Dr. Babcock's June 26, 2001 letter to Dr. Williams, he also stated that Smith was not able work, and requested that she be placed on leave until July 16, 2001.  (Attached to Dep. of Dr. Williams, as Ex. W-2.)  Dr. Williams notified Turck and Thomas that Smith would be unable to work - even work with restriction - as per Dr. Babcock, until July 16, 2001.  (Dep. Of Dr. Williams, Ex. W-4.)  Eventually, Dr. Pastore, Smith's primary care physician filled out a "Health Care Provider Report" on two occasions, July 24, 2001, and August 31, 2001, both of which indicated that Smith would be unable to return to work until September, 2001.

[12] Exxon Mobil eventually denied Smith's workers compensation claim.

managers to compile information on Smith for his review.[13]

On September 18, 2001, Plaintiff received medical clearance from Dr. Williams and returned to work.  Thereafter, she was called to a meeting with Turck and Wagner.  In this meeting, Turck informed Plaintiff that he was unable to determine who had written the comments on the calender and that she was to receive a final written warning with regard to her attendance.  This warning was an indication that if she missed another day of work, she would be terminated from employment.  The final written warning is the last step in Exxon Mobil's Attendance Policy, prior to termination.[14]

---

[13] Turck sent an email to Charnisky, Thomas and McAllister on September 18, 2001, attaching a summary of the investigation of Smith's harassment claims.  McAllister responded to Turck: "You might want to contact John Charnisky and advise him that the Harassment part of this investigation is confidential and should not be passed along as he looks into the rest of the issues.  Best bet would be to have him delete the beginning of your report.  Concern here is the confidentiality we promise when we do these investigations on harassment.  It's a concern for her and the other employees named."  (Pl.'s Opp'n, Ex. M.)  The beginning of the report was the investigation reports into Smith's harassment claim.  One of McAllister's main concerns was that Charinsky should not have those reports, especially because his job dealt with workman's compensation claims and not harassment claims.  (McAllister Dep., at pp. 102-03.)

[14] The Attendance Policy (hereinafter "Policy") provides for a progressive system of discipline that is initially triggered after four or more separate incidents of absence in a twelve-month period and it authorizes the following four steps of discipline: (1) counseling; (2) a written warning; (3) a final warning letter; and, (4) termination.  The Policy has "Forgiveness Factors" based on attendance improvement that allow for the reduction of a penalty and eventually the removal of the employee from the disciplinary process.  Forgiveness factors apply at four, seven and twelve month intervals when the employee is without another incident of absenteeism.  If an employee in the Policy's progressive disciplinary system makes it four months without another incident of absenteeism his or her next absence will result in the same level of discipline previously received.  If an employee in the Policy's progressive disciplinary system makes it seven months without another incident of absenteeism his or her next absence will result in the prior step of discipline than that last received.  If an employee makes it twelve months without another incident of absenteeism, the employee is removed from the Policy's disciplinary process.

Smith was aware of the Policy, but did not have specific knowledge as to its exact terms.  At her September 18, 2001 meeting, Plaintiff questioned why her leave was not counted as Workers' Compensation leave because it stemmed from workplace harassment.  Turck told Plaintiff that he would look into it.  When Charnisky was questioned about the denial of Plaintiff's Workers Compensation claim, he stated that emotional distress from sexual harassment could never be compensable unless it involved a physical touching.  He also indicated that his denial was in part based upon Turck's advice that Plaintiff's stress resulted from non-work related personal matters.  Had

Smith contends that due to her good attendance spanning the four preceding months, she was entitled to a forgiveness factor, that would in effect move her back a stage (away from termination) under the Policy.[15]   Smith's argument rests on the proposition that her leave did not constitute an absence under the Policy.[16]

During the September 18, 2001 meeting, Turck advised Smith that her schedule would change from a swing shift to a rotating shift.  Under Plaintiff's new schedule, every third shift she would be at work during her children's waking hours.  Smith contends that she would not be able to spend any time with them on work days for two weeks at a time.  Plaintiff complained about this schedule change and was advised that it was assigned on the basis of seniority after no one volunteered to accept the schedule.

In an effort to deal with her new schedule, Plaintiff asked co-worker Janet Morris (hereinafter "Morris"), who was permanently assigned to the swing shift, to swap shifts with her. Morris indicated that she would switch, but when Plaintiff raised

---

Plaintiff been approved for Workers' Compensation, her absence would not have been considered an absence under the Plant's Policy.

[15] Exxon Mobil states in its Reply Brief that "forgiveness was discretionary and was not applicable to employees with repeated excessive absences."  (Reply Brief, at p.4.)

[16] This proposition is disputed by Exxon Mobil, which stated that it denied her workman's compensation claim for that time period because it found that Smith's stress was related to personal issue and not a traumatic incident at work.  (Dep. Of John G. Charnisky, at p. 33.)

11

the issue with Turck, he dismissed it and required her to continue working her assigned shift.

Almost immediately upon her return from leave, Plaintiff began to feel that she was being closely monitored by management, particularly Curtis Gainer ("Gainer").[17]  Plaintiff describes Gainer as "hawking" over her, following her to the bathroom, looking for her on short breaks and generally being more persistent and observant of her than other employees.

Following Plaintiff's complaint about Gainer, Turck conducted an investigation.  Turck, Thomas and another Plant employee interviewed Plaintiff and Turck concluded that Gainer did not act inappropriately.[18]  According to Turck and Gainer, the "hawking" was more a result of Gainer's management style and his dismay over the poor attendance record of Plaintiff.[19]

On September 24, 2001, Smith left work early with authorization from Gainer for personal/medical reasons.  On September 26, 2001, Smith was called into meet with Turck and was told that if she left early again, she would be fired.  Smith

---

[17] Curtis Gainer testified in his deposition that the he was told that Plaintiff's shift changed so that one single supervisor would be responsible for her and able to closely monitor her. (Gainer Dep., at p.29.)  Despite this, Turk continued to maintain that seniority issues alone resulted in Plaintiff's shift change.

[18]  McAllister was aware that Smith had made a complaint about Gainer, but he did not get involved. Turck conducted the investigation into Gainer's conduct alone. (McAllister Dep., at pp. 63-65.)  McAllister was aware that Gainer had received counseling and that a complaint was filed by a different female employee regarding Gainer's inappropriate conduct.  (*Id*. at 113-15, 140; *see also* (Pl. Statement of Facts, ¶¶ 36-37.)

[19] Exxon Mobil contends that Gainer supervised both male and female employees in the same manner. Employee Clark Jordan testified at his deposition that Gainer also closely supervised him.

points out that leaving after a shift is half-way completed does not count as a violation under the Attendance Policy.[20]

Another incident in which Plaintiff was the subject of derogatory graffiti took place on October 5, 2001.  On the wall of the Plant's elevator, Plaintiff observed the words "Kim Blows."[21]  When she reported to incident to management, management responded by covering up the words with paint and conducting an investigation.[22]  The investigation did not uncover the responsible party.

On December 7, 2001, Plaintiff was required to work an overtime shift commonly referred as a "force" shift.[23]  Employees usually did not know they would be required work this shift prior to arrival, and in the case of Plaintiff, it had a significant impact on her childcare situation.  Plaintiff's co-workers were aware of her dilemma and teased her.  One co-worker drew a hangman picture on the lunchroom dry erase board with the letters "F_RE_."[24]  Plaintiff complained to her shift supervisor, Bob Robostello, who in turn informed Turck.  Smith interpreted the

---

[20] During his deposition, Wagner confirmed this policy.  (Wagner Dep., at pp. 74-75.)

[21] Exxon Mobil and the Union both assert that Spellman was the one who first observed the elevator graffiti. He immediately responded by painting over it.  Smith asserts that she saw it first and complained about it to Spellman.

[22] Plaintiff contends that after covering up the graffiti with paint, Exxon Mobil took no further action.

[23] Force shifts are a result of seniority and manpower shortages.  They require employees to work a sixteen (16) hour double shift.

[24] If the hangman game was completed, the word "fired" could be spelled.

message to be harassing and mocking.  Turck indicated that there
was no way to know whether the hangman was directed toward her.[25]


D.

On December 13, 2001 Plaintiff was informed by a Plant
employee that she had an emergency phone call from her
babysitter.  The babysitter informed Plaintiff that her daughter
had an extremely high temperature and that she could not get her
daughter to calm down or stop crying.  The babysitter was scared
and indicated that she needed Plaintiff to come home.  Plaintiff
advised her supervisor Spellman and requested permission to
leave.  Spellman told Plaintiff, "go do what you gotta to do,"
and Plaintiff took this response as having permission to leave.
Plaintiff went home and tended to her daughter, but did not
follow up with management and inform them as to the situation.
In the morning, Plaintiff called her daughter's doctor's office
and advised them that the fever had broken.  The doctor's office
informed her that it would not be necessary to bring the child
in.[26]

---

[25] Spellman, a supervisor at the Plant, conducted an investigation into the hangman drawing and interviewed two employees.  At his deposition, Spellman indicated that the drawing was directed at Plaintiff and that he had advised Turk that the employees he had questioned knew who made the drawing.

Exxon Mobil admits that Spellman interviewed two employees suspected of drawing the hangman, but contends that there is absolutely no evidence that the hangman picture or the letters "FRE" had anything to do with Plaintiff's gender.  Instead, the "FRE" letters were a gender-neutral harassment directed at those employees, whether male or female, that were required to work the "force" shift.

[26] Both Exxon Mobil and the Union were suspicious of Plaintiff's reason to leave.  They note that Plaintiff failed to provide any documentation that her daughter was ill or that she took her to the doctor's office.

Upon returning to work the next day, Plaintiff was approached by Spellman who indicated that Turck wanted to see her in the front office of the Plant.  In the meeting, Turck, joined by Wagner, informed Plaintiff that because she left work without authorization, she would be sent home pending an investigation. Turck showed Plaintiff an email from Spellman which stated that Plaintiff had left early the night before without permission.[27]

On December 19, 2001, Plaintiff met with Turck, Wagner and Thomas.  At the meeting, Wagner proposed that Plaintiff receive a 30 day suspension and/or be placed on probation.  (Wagner Dep., at pp.78-81.)  Both alternatives were declined and the decision to fire Smith was made.

### E.

As per the collective bargaining agreement (hereinafter "CBA") between Exxon Mobil and the Union, the Union immediately filed a grievance on Plaintiff's behalf.[28]  Thomas reviewed the grievance and affirmed the decision to terminate Plaintiff.

Pending Plaintiff's termination, the Union was obligated to consider whether under the terms of the CBA, it should arbitrate the dispute.  Initially, in January 2002, the grievance came

---

[27] The general procedure followed at the Plant allows the supervisor to let an employee go home early.  The fact that Smith was at the final warning stage meant that a special rule applied - zero tolerance for absenteeism. (Wagner Dep., at pp. 73-74.)

[28] Plaintiff states that she herself filed the grievance.

before the Union Negotiating Board (hereinafter "the Board").
Upon the recommendation of Jonathan Walters, Esquire, Counsel to
the Union (hereinafter "Union Counsel"), the Union deferred
consideration of the grievance in order to obtain more
information about Plaintiff's attendance record.  Union Counsel
wanted to determine whether Exxon Mobil had, in terminating
Plaintiff, run afoul of the Family and Medical Leave Act of 1993,
29 U.S.C. § 2601, *et seq*.  The Union also secured from Exxon
Mobile an extension on proceeding to arbitration.

On February 26, 2002, the Union made a determination of the
merits of Plaintiff's claims and whether it should proceed to
arbitration on her behalf.  Considering her disciplinary
record,[29] her attendance record, her history of leaving work
early and her explanation for leaving work on December 13, 2001,
the Board[30] voted unanimously, five to zero, not to arbitrate the
case.  Union Counsel believed that the likelihood of success in
arbitrating the case on behalf of Plaintiff was too low to move

---

[29] Exxon Mobil makes little mention of Plaintiff's disciplinary record, making it appear that disciplinary issues were not factors in the decision to fire her.  The Union cites to a number of disciplinary problems characterized by Plaintiff as "minor."  On May 20, 1998, Plaintiff received a warning for not wearing safety glass in a production area.  On December 29, 1998, she was suspended for two days (later reduced to one day after a grievance was filed from the Union) for violation of safety rules.  From May 11 through 13, 1999, she served a three days suspension because she filled up drums with the wrong product.  On October 16, 1999, she was given verbal coaching because she took three and a half hours to start a drum run.  On March 24, 2000, she was given a verbal coaching for leaving her work area without permission.  In April 2001, she was given verbal counseling because she had used 24 reconditioned drums for a product which specifically required new drums.  Finally, on June 14, 2001 she was chastised, but not formally counseled, for an unexplained two hour absence from her work station.

[30] The Union further asserts that the Board members are impartial in the matter having had no dealings with Plaintiff.

forward.  On March 1, 2002, the Union advised Plaintiff of its decision not to arbitrate.

### F.

Both Exxon Mobil and the Union contend that Plaintiff's firing was exclusively as a result of her attendance record and not in retaliation for complaints of sexual harassment.[31]  Exxon Mobil stated that Plaintiff missed a total of 213 days of work,[32] approximately 20% of her scheduled working days during the 4.5 years of her employment.  Plaintiff asserts that Defendants have misrepresented her employment record; she notes that Exxon Mobil's calculation includes partial days off,[33] FMLA leave time, medical leave,[34] and suspension time which was reinstated and/or counted as vacation time.

---

[31] Wagner testified that he did not know of anyone else being fired under the Attendance Policy, or anyone receiving an "occurrence" under the Policy for leaving work more four hours into the shift since Smith's termination. (Wagner Dep., at pp. 114-15.)

[32] In a different location in its papers, Exxon Mobil asserts that Smith missed 194 days of work.

[33] Employees who left work before the end of their shift, but have worked at least four hours are not normally charged with an occurrence under Exxon Mobil's absence policy.

[34] From March 8, until March 18, 1998, Plaintiff was on medical leave with an upper respiratory infection; from July 9, until August 8, 1998 with bronchitis; from March 3, until March 15, 1999, with an upper respiratory infection; from May 14, until May 28, 1999, with Chronic Fatigue Syndrome; from October 21, until November 22, 1999, with Bronchitis and Lumbar Radiculopathy; and, from December 7, until December 14, 1999, with a throat abscess (requiring hospitalization).  From June 19, until June 29, 2000, Plaintiff was absent from work as a result of a miscarriage, gastroesophagal reflux and gull bladder disease; and, from September 24, until October 2, 2000, because of Tonsilitis that required a two day hospital stay.  In 2001, Plaintiff missed time from January 3, until February 5, 2001 because of a reoccurrence of her Tonsilitis and to have six (6) teeth abstracted.
Smith notes that she was absent 58 days in 2001, due to the stress from the mounting acts of harassment, culminating with the defacing of the Norman Rockwell calender. She was on leave from July 26, 2001, through September 17, 2001.

Defendants further imply that the timing of Plaintiff's complaints is suspicious, because the complaints were made after disciplinary measures were instituted against Smith.

Exxon Mobil point to numerous instances where Smith's absences became an issue prior to her lodging complaints.  On January 27, 2000, Plant Manager Thomas issued a warning letter to Smith regarding her attendance record from 1999.  Later in that year, on October 13, 2000, Plaintiff received a second infraction, which resulted in her being placed under review and given a verbal counseling by her supervisor, Spellman.

On or about February 13, 2001, Plaintiff received a formal letter of warning from Operations Manager Turk.  The letter stated that Plaintiff had previously received verbal counseling and that her absences from January 3, through February 3, 2001 resulted in an interruption of service levels, increased cost and productivity levels.  It further stated that a continued pattern of excessive absenteeism would not be acceptable and without improvement in attendance, further disciplinary action would result, up to and including termination.

From July 26, until September 17, 2001, Plaintiff was placed on stress leave.  When she returned, she received a final written warning specifically stating that she would be fired if her attendance did not improve.  Within ten days of this final written warning, Plaintiff had to be counseled with respect to

her leaving work early and was advised that further instances of leaving early would be dealt with under the Absence Control Program.

Finally, on December 14, 2001, Plaintiff was informed that her decision to leave work to take care of her sick child was considered another unauthorized absence.  She was sent home and subsequently terminated on December 19, 2001 for what Exxon Mobil contends was a consistent failure to attend work on a regular basis.

## II.

The test for summary judgement is stated in Rule 56 of the Federal Rules.  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there

is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but. . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (citation omitted).

III.

Smith has basically raised two claims under NJ LAD, (1) that there was a sexually hostile work environment and (2) that she was retaliated against because she complained about the sexual harassment.

A.

To establish a prima facie case under LAD for a hostile work environment, Smith must show that the alleged conduct "(1) would not have occurred *but for* the employee's gender; and it was (2) *severe or pervasive* enough to make a (3) *reasonable woman* believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive.*" *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 603-04 (1993).

Exxon Mobil reviews each incident of alleged harassment in isolation and individually applies the *Lehmann* standard. Smith

suggests that such individualized review is inappropriate and that this Court should look at the totality of circumstances when evaluating a complaint based on claims of hostile work environment. *See Hurley v. Atlantic City Police Dept.*, 174 F.3d 95, 110 (3d Cir. 1999).

Exxon Mobil argues that *Hurley* does not apply, as it dealt with the admission into evidence of prior incidents of sexual harassment to support the plaintiff's claim that the defendant's given reason for termination was a pretext for discrimination. Exxon Mobil suggests that this Court should perform an individual analysis of each alleged incident under *Lehmann* standard. We decline. At this stage in the litigation, our role is to determine if Smith has raised triable issues of fact as to her claim that there was a hostile work environment. It is not necessary for us to undergo an extensive evaluation of the merits of each of Plaintiff's claims.

1.

Smith has raised an issue of material fact as to whether the conduct would have occurred but for the fact that she is a woman. Insensitive or uncivil comments made in the work place will not rise to per se violations under the LAD. *Herman v. Coastal Corp.*, 348 N.J. Super. 1, 20 (App. Div. 2002). The derogatory language alleged in the instant case goes beyond uncivil; the

alleged language and conduct was not merely sexual in nature, but was arguably directed at Smith because she was a single woman.

Smith has shown that co-workers used explicit language to describe her physical appearance, namely parts of the female anatomy, and to suggest that she was intimately involved with other employees.  Smith has countered Exxon Mobil's argument regarding Gainer's behavior by offering detailed testimony on the reasons why she thought Gainer treated her differently.  She has testified that much of what was said to her was indeed based on the fact that she was a woman, and had dated two co-workers in the past.  The language used, the continuous focus on Smith, and the numerous incidents alleged, all vault Smith over the summary judgement threshold as to the first prong of the *Lehmann* test.

Viewing the facts in a light most favorable to the Plaintiff, we do not accept Exxon Mobil's contention that the alleged harassment was merely teasing and it was not based on gender.  Exxon Mobil may offer its testimony that Smith's shift supervisor, Gainer, treated both male and female employees in an equally gruff manner and that the hangman incident was entirely gender-neutral at trial, but these arguments do not justify summary judgement at this time.

2.

Smith has cited and expounded on a series of incidents that

she claims created a hostile work environment.  For the most part, Exxon Mobil does not contest that these events occurred, but rather focuses its arguments on why the events were not gender-based and the remedial response it offered.  In its Reply Brief, Exxon Mobil states that the events were neither severe nor pervasive, utilizing Smith's complaint about pornography as an example.  Smith has alleged that she was exposed daily to various pornographic materials.  While Exxon Mobil points out that management disposed of those materials once Smith brought it to their attention, it does not deny that on numerous occasions pornography was left in the open for Smith to observe.

Without ruling on the merits of Smith's case, we find that her complaints of daily teasing, name calling, exposure to pornography, and ultimately, vandalism on company grounds that featured her name and sexual references, allege behavior that is sufficiently severe and pervasive to survive summary judgement.

3.

In addition, for the reasons explained above, Smith has raised a material dispute of fact as to whether a reasonable woman would believe that the conditions of employment were altered and that a hostile or abusive working environment existed.

B.

In order to state a claim for retaliation under LAD, Smith must show that (1) she was involved in a protected activity, such as opposing conduct or practices that are forbidden under LAD; (2) she faced an adverse employment decision by Exxon Mobil; and (3) a causal link between the first and second prong exists.  *See Romano v. Brown & Williamson Tobacco Corp.*, 284 N.J. Super. 543, 548-49 (App. Div. 1995).  If Smith meets the three prong test, the burden shifts to Exxon Mobil, who must then "articulate a legitimate, non-retaliatory reason for the decision."  *Id*. at 549.  Smith can respond and produce "evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely a pretext for the underlying discriminatory motive."  *Id*.

Smith engaged in a protected activity when she turned to various levels of management with complaints regarding the work environment and sexual harassment.[35]  She was also subject to an adverse employment decision, as she was allegedly subjected to less than fair treatment[36] and ultimately fired.  *Cf*. *id*.  Thus

---

[35] Exxon Mobil appears to argue that Smith's activity is not protected because her retaliation claim is based only her complaint regarding Gainer, her shift supervisor.  Exxon Mobil's argument mis-characterizes Smith's claim.  Smith's retaliation claim is based on a number of incidents, the first of which is her complaint in June, 2001, regarding the defacing of the Norman Rockwell calender.  Smith claims that not only did her co-workers continue to harass her after she made the complaint, but that management divulged information regarding her complaint to her co-workers.

[36] Exxon Mobil disputes that Smith was punished for making a complaint following the Norman Rockwell calender incidents.  Smith has alleged, however, that among other retaliatory actions (1) she was made to wait for hours before meeting with a representative from human resources, (2) she was subject to an intensive investigation,

the first two prongs are satisfied.

In addressing the third prong, "causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive." *Id*. at 550.  Smith offers that inferences can be drawn from Turck's alleged conduct following her complaint about the defacing of the Norman Rockwell calender, namely his failure to perform a thorough investigation of her complaints, his improper imposition of the attendance policy's provisions, his singling Smith out in enforcing certain rules and his initiation of an extensive investigation into her work history.  Smith has offered testimony that she was indeed singled out after she complained about the work environment and the manner by which her complaints were being investigated.

Exxon Mobil claims its reasons for firing Smith were entirely performance based, specifically her poor attendance record.  Even if we take Smith's calculation over Exxon Mobil's assessment, it is clear that Smith was absent from work many, many times.  However, we need not decide if Exxon Mobil's reasons were in fact legitimate at this juncture, and will assume for purposes of the instant motion for summary judgement that they were.

Assuming the burden shifts back to Smith, she is "afforded

---

(3) she was placed at the final warning level under the attendance policy, (4) her schedule was switched and she was not allowed to alter it, (5) she was subject to "Smith only rules," which were more stringent than the rules applied to her co-workers, and (6) she continued to face harassment, while the management did not take appropriate action, but instead divulged confidential information regarding her complaint to her co-workers.

the opportunity to show that a discriminatory intent motivated
the defendant's actions, and not the legitimate reason offered by
defendant." *Romano*, 284 N.J. Super. at 551.  "In the context of
surviving summary judgement, plaintiff need only raise a genuine
issue of fact with regard to the employer's actual motive." *Id*;
*cf. Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994) (discussing
standard for rebutting defendant's proffered reason at summary
judgement stage in civil rights, Title VII action).  Thus, Smith
need only show at this time that Exxon Mobil fabricated the
performance/absenteeism reason after the fact or that the
performance/absenteeism reason is merely a pretext and did not
actually motivate Exxon Mobil to fire her.  *See Fuentes*, 32 F.3d
at 764-65.

     Smith has argued that Exxon Mobil's proffered reasons are a
pretext.  While Exxon Mobil has articulated a legitimate
performance-based reason for terminating Smith, she has
sufficiently pointed out the inconsistencies and weaknesses in
Exxon Mobil's reasoning and decision.  Smith has called into
question the calculation method utilized in determining that she
was at the final stage of the Attendance Policy and has provided
evidence that the Policy was applied to her in a different manner
than to other employees.  Smith has also pointed out that the
timing of the "investigation" into her work history coincided
with her complaints about the defacing of the Norman Rockwell

calender.  The deposition testimony of Gainer also shows that she was re-assigned to a position so that she could be closely watched.  While a reasonable fact finder could find that Exxon Mobil's decisions were performance based, one could just as reasonably find that its reliance on Smith's absenteeism was merely a pretext.

C.

Relevant to the discussion of Smith's allegations under the NJ LAD is a determination of whether or not Exxon Mobil may be held liable for the actions of its employees.  In New Jersey, "an employer whose supervisory employee is acting within the scope of his or her employment will be liable for the supervisor's conduct in creating a hostile work environment."  *Lehman*, 132 N.J. at 619-20.  In cases where the supervisor[37] is not acting within the

---

[37] A distinction exists between harassment at the hands of a co-worker and harassment at the hands of a supervisor.  In limited situations, an employer may be held liable where the harassment was due to the conduct of a co-worker who was not plaintiff's supervisor.  *See Heitzman v. Monmouth County*, 321 N.J. Super. 133, 145-46 (App. Div. 1999) (declining to hold an employer vicariously liable for the isolated, single statement of a co-worker who was not a supervisor of the plaintiff).

The court in *Heitzman* noted that generally employers are not held liable for the actions of co-workers, because under agency principles, "employers do not entrust mere co-employees with any significant authority with which they might harass a victim."  *Id*. at 145-46 (citation and quotations omitted).  Thus, an employer is only liable for the harassing behavior of a non-supervisory employee when "management-level employees knew, or in the exercise of reasonable care should have known, about the campaign of harassment."  *Id*. at 146 (citation omitted).

In order to determine if a co-worker has "supervisory" status for the purpose of invoking vicarious liability, courts are directed to examine "whether the power the offending employee possessed was reasonably perceived by the victim, accurately or not, as giving that employee the power to adversely affect the victim's working life.  Thus, such indicia as the power to fire and demote, to influence compensation, and to direct all job functions would be probative of supervisory status, but would not exclude other indicia.  Also relevant would be any evidence that the alleged harasser controlled the workplace in subtler and indirect ways, as long as the effect was to restrict the victim-employee's freedom to ignore sexually harassing conduct."  *Entrot v. The BASF Corporation*, 359 N.J. Super. 162, 181 (App. Div. 2003).  In *Entrot,* the court found that a triable issue of fact existed as to whether the defendant-employee was a "supervisor," because deposition testimony showed that while he could not fire the plaintiff, he gave

scope of his employment, the employer may still be liable. For example, an employer will be held vicariously liable in situations where it delegates authority to control a work environment to a supervisor, and the supervisor abuses that authority, or where sexual harassment is foreseeable and the employer is negligent in having in place or enforcing anti-harassment policies, or where the employer intended for or gave apparent authorization to the harassing conduct  *Id*. at 620-24 (referencing Restatement (Second) of Agency § 219); *see also Entrot,* 359 N.J. Super. at 172-73.

The U.S. Supreme Court held that in Title VII actions that an employer can avoid liability for supervisory conduct by asserting an affirmative defense showing that it "had exercised reasonable care to avoid harassment and to eliminate it when it might occur, and that the complaining employee had failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided." *Faragher v. City of Boca Raton*, 524 U.S. 775, 805 (1998); *see also Burlington Industries, Inc. V. Ellerth*, 524 U.S. 742 (1998). While not "expressly adopted" by the New Jersey Supreme Court, this affirmative defense has been favorably treated by the New Jersey Appellate Division. *See Entrot*, 359

---

input to management about her performance, he could bring disciplinary action against her, he acted as the "project leader" and he allegedly "directly invoked his job authority over plaintiff as a way to coerce her to submit to his sexual advances." *Id*. at 184-85.

N.J. Super. at 187-88 (noting that "[t]here is no barrier to the application of a Title VII defense to a LAD action").

However, this affirmative defense would have limited application in the instant matter, as it is not "available. . . when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion or undesirable reassignment." *Ellerth*, 524 U.S. at 765.  Furthermore, in *Entrot*, the court found the defense was also not available in cases where the plaintiff alleges constructive discharge.  359 N.J. Super. at 189-94.  Thus, the defense would be precluded as to the bulk of Smith's complaints.

Smith has raised triable issues as to whether Exxon Mobil should be held vicariously liable.  She has asserted a viable claim that her supervisors were acting within the scope of their employment;  if they were not, she has raised a triable issue as to whether Exxon Mobil "contributed to the harm though its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was aided in the commission of the harassment by the agency relationship."  *Lehman,* 132 N.J. at 624; *cf. Gaines v. Bellino,* 173 N.J. 301, 319 (2002) (finding that plaintiff had raised a triable issue of fact as to whether or not the defendant had an effective anti-harassment policy in place; the alleged negligence of the defendant could not be resolved at summary judgement stage).

As for the conduct of her co-workers, Smith has presented sufficient evidence to survive summary judgement.  Deposition testimony shows that the management knew to some degree of the harassment, and there is further evidence that would allow a reasonable fact finder to determine that management should have been aware of the conduct of the employees, even when Smith did not officially file a complaint (such as with regard to the pornographic material and the name-calling).  *See Heitzman*, 321 N.J. Super. at 146.  There is also a dispute of fact as to whether the efforts taken by Exxon Mobil to deal with Smith's complaints were timely or reasonable under the circumstances. *See Gaines,* 173 N.J. at 333.

IV.

A.

A claim for Intentional Infliction of Emotional Distress ("IIED") requires a showing "(1) that the defendant acted intentionally or recklessly, both in doing the act and in producing emotional distress; (2) that the defendant's conduct was so outrageous in character and extreme in degree as to go beyond all bounds of decency; (3) that the defendant's actions were the proximate cause of the emotional distress; and (4) that the emotional distress suffered was so severe that no reasonable person could be expected to endure it." *Wigginton v. Servidio*,

324 N.J. Super. 114, 130 (App. Div. 1999).

Determining the intent of the defendant is a question for the fact finder. *Id.* at 131. In cases where the defendant allegedly spoke in such a way as to create a hostile work environment, the intent of the defendant can be inferred from the remarks themselves. *Id.*

Asserting a claim of IIED against a co-worker or supervisor in the hostile work environment context differs from asserting a claim of IIED against a "stranger on the street," because "[t]he employer's position of authority and power over the plaintiff and the abuse of the employer-employee relationship can both contribute to a finding of extreme and outrageous conduct." *Id.* Employers are bound by "a higher duty than strangers to avoid inflicting emotional distress." *Id.* Again, the issue of whether a comment or a course of conduct is extreme and outrageous is a determination for the fact finder. *Id; see also Taylor v. Metzger*, 152 N.J. 490, 512-13 (1998) (noting that while the defendants put forth legitimate arguments that would allow a reasonable jury to "conclude that the defendant's conduct was neither extreme nor outrageous," a reasonable fact finder could reach other conclusions based on the facts alleged by the plaintiff).

In judging the plaintiff's reaction or emotional distress, "mere allegations of 'aggravation, embarrassment, an unspecified

number of headaches, and loss of sleep,'" may be insufficient as a matter of law. *Wigginton*, 324 N.J. Super. at 132 (citing *Buckley v. Trenston Sav. Fund*, 111 N.J. 355, 368 (1988)).  If, however, a fact finder could reasonably find that a reaction lasted a "considerable period after the event" and was more than the insufficient reaction described in *Buckley*, the last prong of the IIED test would be satisfied.[38] *Id.*

### B.

Plaintiff has raised an issue of material fact as to the extremity of the conduct and the underlying intent.  Taking in a light most favorable to the non-moving party, Smith's claim that her co-workers and superiors created a hostile work environment will survive summary judgement.  She has also stated a claim for retaliation.  Exxon Mobil does not deny that a calender was defaced by Smith's co-workers, nor does it deny that the phrase "Kim Blows" was graffitied in a common area.  Exxon Mobil also has not contested Smith's claims that co-workers, including Wagner, teased her and called her names.  Finally, while Exxon

---

[38] In *Wigginton*, the Appellate Division found that the plaintiff's testimony regarding her extensive and intense reaction immediately following the single alleged incident of sexual harassment and for some time after, coupled with observations from others that corroborated her testimony, was sufficient to allow her IIED claim to go forward. *Id*. at 131-32.

In *Taylor*, the court found that the plaintiff presented sufficient evidence of severe emotional distress to allow her IIED claim to go forward, relying on the fact that she went to a therapist for as long as she could afford to do so, she purchased a bullet-proof vest for safety, she was treated for anxiety, and she suffered from mood changes, insomnia, flashbacks, and nightmares for almost two years following the incident.

Mobil claims it is of little importance, it does not argue with Smith's claim that pornographic materials were in plain view in the general work area.  A reasonable fact finder could find that the conduct was not only intentional or reckless, but also extreme in nature.  Intent can be inferred from the conduct; intent may also be inferred from the alleged lack of response by management to investigate and prevent future harassment.

Exxon Mobil's arguments that the incidents complained of were isolated incidents, to which it responded quickly, can be made to the fact finder, but do not justify the grant of summary judgement.  Additionally, it is left to the fact finder to determine if the conduct towards Smith was, as Exxon Mobil argues, merely office teasing and not sex-specific, intentional slurs.  Finally, while Exxon Mobil has consistently averred that Smith was fired due to her poor performance, it is for the fact finder to determine if the course of conduct, which Smith alleged constituted sexual harassment and retaliation, was in fact motivated solely by Smith's work history.

Plaintiff has also shown that a reasonable fact finder could hold that she suffered severe emotional distress that no one would be expected to endure.  While Exxon Mobil has suggested that Smith's stress was caused by personal, not work related, issues, Smith has raised a material issue of fact on this point. Her testimony, along with medical evidence, shows that she was

extremely distraught immediately following the calender defacing incident.  Regardless of whether it was Exxon Mobil's doctor or her own personal physician who prescribed leave for her stress, the strength of her immediate reaction and the length (almost sixty days) of her leave are sufficient for a reasonable fact finder to hold that she satisfied the elements of an IIED claim.[39]

Finally, Smith has presented evidence that would allow a reasonable jury to find proximate cause.  Again, Exxon Mobil may raise its argument, that Smith suffered from stress due to personal issues outside the workplace, before the fact finder, and it is up to the fact finder to agree or reject that argument.

Summary judgement will be denied as to Smith's claim for IIED.

V.

Smith's claims for negligent infliction of emotional distress ("NIED") will be dismissed.  The New Jersey Workers' Compensation Act, N.J.S.A. § 34:15-8, provides the exclusive remedy by which an employee may recover for injuries caused by workplace negligence.  *See Rivera v. Crackel Barrel Old Country*

---

[39] In addition, after filing the instant law suit, Smith was seen by a psychiatrist who found that she "show[ed] evidence of having post traumatic stress disorder from her perception of what happened at Mobil Oil.  She continues to have anxiety, flashbacks and bad dreams concerning how she was treated there.  These problems need to be addressed." (Pl. Opp'n, Ex. O.)

*Store, Inc.*, 02-4160, 2003 WL 21077965, at *5 (D.N.J. Mar. 3, 2003); *Ditzel v. Univ. of Medicine and Dentistry*, 962 F. Supp. 595, 608 (D.N.J. 1997).

VI.

Exxon Mobil argues that punitive damages are only appropriate when the conduct is especially egregious. *Lehmann*, 132 N.J. at 624-26. Furthermore, as an employer, it contends that it can only be liable for punitive damages if upper management participated in or acted with willful indifference to the wrongdoing. *Id*; *Hurley*, 174 F.3d at 123. Exxon Mobil has provided testimony that it investigated most, if not all, of Smith's complaints, and in the cases where it did not investigate it diffused the situation. For example, while the owner of the pornographic material was never sought out, the supervisor disposed of the material immediately. In addition, while limited investigations were conducted with regard to the hangman drawing and the "Kim Blows" graffiti, Exxon Mobil contends that it contained the situation by erasing/painting over the writings quickly.

Based on our conclusions *supra*, Smith has raised a material issue of fact as to the extent to which Exxon Mobil investigated her complaints. She has testified that management divulged confidential information to her co-workers. Her testimony, along

with the testimony of other employees, shows that the identities
of employees who defaced the calender, graffitied "Kim Blows" and
drew the hangman picture were never uncovered.  There is an
implication that certain members of management did not actively
seek out the perpetrators; Exxon Mobil defends the alleged lack
of investigation by arguing that the conduct alleged was found to
be not offensive.  The deposition testimony also indicates that
the sexual harassment investigation at some point shifted focus
to an investigation of Smith's work history.  In addition, while
Smith did not initially complain about the gender-based name
calling and teasing, she has testified that management allowed
such conduct to continue; indeed, Wagner admitted to calling
Smith a "bitch" on at least two occasions, although he asserts
that it was not sexual harassment.  A reasonable fact finder
could conclude that management was not only willful in its
ignorance of the work environment, but also that it encouraged
certain forms of harassment.

    Smith's claim for punitive damages will stand.


                          VII.

    For the reasons set forth above, the Court will grant in
part and deny in part Defendant Exxon Mobil's Motion for Summary
Judgement.  Smith's claim for negligent infliction of emotional
distress, Count IV of the Complaint, will be dismissed.  However,

the remaining claims, namely her claims under the NJ LAD (Counts I and II) and her claim for intentional infliction of emotional distress (Count III) will survive Exxon Mobil's motion for summary judgement.  In addition, her claims for punitive damages will stand.  The Court will issue an appropriate Order.


Date:   6/27/05


                                    s/Joseph E. Irenas
                                    Joseph E. Irenas, S.U.S.D.J.