UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KIMBERLY SMITH, | HONORABLE JOSEPH E. IRENAS |
| Plaintiff, | CIVIL ACTION NO. 02-4425 (JEI) |
| v. | **OPINION** |
| EXXON MOBIL CORP., INDEPENDENT OIL WORKERS AT PAULSBORO, NEW JERSEY, and JOHN DOES 1-20, | |
| Defendants. | |

**APPEARANCES:**

GRUCCIO, PEPPER, DE SANTO & RUTH, P.A.
By: WILLIAM G. BLANEY, ESQ.
817 Landis Avenue
P.O. Box 1501
Vineland, NJ 08362-1501
(856) 691-0100
    Attorneys for Plaintiff

McCUSKER, ANSELMI, ROSEN, CARVELLI & WALSH
By: JOHN B. McCUSKER, ESQ.
    JOSEPH T. WALSH, III, ESQ.
127 Main Street
Chatham, NJ 07928
(973) 635-6300
    Attorneys for Defendant Exxon Mobil Corp.

MARKOWITZ & RICHMAN
By: R. MATTHEW PETTIGREW, JR., ESQ.
121 South Broad Street
Suite 1100
Philadelphia, PA 19107
(215) 875-3100
    Attorneys for Defendant Independent Oil Workers

**IRENAS,** Senior District Judge:

    Presently before this Court is the Motion for Summary

1

Judgement by the Defendant Independent Oil Workers at Paulsboro (the "Union").  Summary judgement will be granted in part and denied in part.

Summary judgement is warranted as to Plaintiff's claims against the Union in Counts II and III.  Plaintiff has not raised any triable issues of fact as to whether the Union retaliated against her, and so her retaliation claim under the New Jersey Law Against Discrimination ("NJ LAD") will be dismissed.  In addition, because she has not demonstrated that the alleged conduct meets the requisite level of extremeness or outrageousness, her claim for intentional infliction of emotional distress will also be dismissed.  Plaintiff, however, has raised triable issues of fact as to her claims in Counts I, IV and V, and so summary judgement will be denied as to her claim under the NJ LAD for hostile work environment, her claim for negligent infliction of emotional distress, and her claim for breach of the duty of fair representation.

I.

Plaintiff Kimberly Smith ("Smith" or "Plaintiff") brought an action in the Superior Court of New Jersey against her former employer, Exxon Mobil Corporation ("Exxon Mobil") and the bargaining unit at Exxon Mobil, the Independent Oil Workers at Paulsboro, New Jersey (the "Union").  Smith worked for Exxon

2

Mobil as a Package Operator at the Gloucester County Plant (the "Plant") from June 1997, until she was fired on December 19, 2001.  Smith was a member of, and represented by, the Union during her tenure at the Plant.

With respect to both Defendants, Smith alleges claims for hostile work environment and retaliation under the New Jersey Law Against Discrimination ("NJ LAD"). (Counts I & II.)  She also makes claims for negligent infliction of emotional distress and intentional infliction of emotional distress.  (Counts III & IV.)  Finally, she alleges breach of contract, referring to the Collective Bargaining Agreement ("CBA"), and breach of duty of fair representation. (Count V.)

The Court will not repeat in full the extensive and detailed facts of this matter, especially with regard to Plaintiff's allegations of sexual harassment and retaliation.  An Opinion, dated June 27, 2005, Docket Entry No. 40, in which this Court granted in part and denied in part Exxon Mobil's Motion for Summary Judgement, provides a detailed discussion of the work environment and Plaintiff's allegations of mistreatment.  A few points relevant to the instant motion, however, will be discussed.

II.

Smith has described the Plant as a male dominated work place, in which sexual harassment is widespread and condoned by management and the Union.  She further claims that when she complained about the sexual harassment, the management and the Union did not respond appropriately and later took retaliatory action against her.  We note that in the June 27, 2005, Opinion, we denied Exxon Mobil's Motion for Summary Judgement as to her claims under the NJ LAD and her claim for intentional infliction of emotional distress against Exxon Mobil.

A.

The hostile work environment Smith describes included many alleged incidents of harassment, from name calling to vandalism.

1.

The two main incidents of vandalism included the defacing of a work calender in June, 2001, and the writing of the words "Kim Blows" in graffiti on an elevator.  The calender incident involved the defacing of illustrations accompanying two months of a calendar used for work-related matters.  The markings were taken by Smith to imply that she had sexual relations with co-workers and to mock her based on her status as a single mother

4

with significant child care issues.[1]

Smith complained to management about the calender incident, and on June 22, 2001, she met with Craig Turck, the Plant Operations Manager, and George Wagner, her Union representative.[2] Following the meetings, Smith claims her co-workers treated her in such a way (mocking and teasing her) to indicate that they knew information which she had shared only with Turck and Wagner.

Smith met again with Turck and Wagner on June 26, 2001, to express her concerns that her co-workers knew the details about her harassment complaint.[3]  Both Turck and Wagner asked Smith to reveal the names of the employees who bothered her. Smith, however, refused to provide these names as she was fearful and anxious that she would face increased retaliation from her co-workers.

Turck and Wagner set up another meeting later that day with

---

[1] The calendar featured Norman Rockwell portraits.  A picture entitled "The Babysitter" accompanied the month of February.  It depicted a young woman with a crying baby in her arms.  A co-worker wrote "Kim" on the woman's body and the name of a male co-worker on the woman's arm.  The illustration for the month of June was called "The Shiner" and featured a young woman with a black eye sitting outside the school principal's office, waiting to be disciplined.  A co-worker wrote Plaintiff's name on the woman's chest and the name of the two male co-workers she had previously dated on each arm, simulating tattoos.  When Smith viewed the calender, she scribbled out her name and wrote "leave me alone."  Thereafter, a co-worker wrote back: "love you."

[2] Wagner's official title is Chairman of Representatives for those Union members who work at the Plant.  Smith asserts that Wagner was the highest ranking Union official working at the Plant.  According to the President of the Union, Edward Majewski, there are two Chairman of Representatives, one for the Plant and one for a separate entity, the Valero Refinery.  In the Union hierarchy, the Chairman of Representatives is below the Union president, but above the Executive and Negotiating Boards.  (Majewski Dep., at p. 13.)

[3] Sometime during the day on June 26, 2001, a conversation Smith had with Curtis Gainer, a supervisor at the Plant, was reported to Turck.  Smith had complained to Gainer that Wagner had inappropriately touched her and said "I don't see any tattoos" (referring to the defaced calender picture).  (Turck Meeting Notes.)

John Thomas, the Plant Manager.  Smith was visibly shaken during the meeting, so after the meeting concluded, she was escorted to the Plant's in-house doctor's office.

At some point, Smith was told that she would speak with Peter McAllister ("McAllister"), a Human Resource representative of Exxon Mobil from outside the Plant.  Smith arrived the next day, June 27, 2001, at 9:00 am for her meeting with McAllister.  However, according to Smith, McAllister did not arrive until 1:00 pm.  Plaintiff felt that Turck and Thomas made her wait for McAllister in an effort to retaliate against her for complaining about sexual harassment.  Smith claims that she shared this opinion with McAllister and that he agreed with her assessment.[4]  At some point during their meeting, Smith complained to McAllister about Wagner, although the scope of her complaint is in dispute (i.e. whether it revolved around Smith's lack of trust in Wagner as her Union representative to advocate zealously or whether it also included complaints about derogatory and/or sexual comments Wagner allegedly made in reference to Smith).  Shortly after her meeting with McAllister, Smith went on medical/stress leave until September 18, 2001.[5]  She claims that

---

[4] McAllister did not recall discussing this with Smith. (McAllister Dep., at pp. 39-41.)  He testified that someone from the Plant management would have set up the meeting time; when he travels he normally will not arrive to the Plant until around 10:00.  (*Id.*)

[5] Smith met with a psychologist, Dr. Babcock, recommended by Exxon Mobil's in house physician, Dr. Williams.  Dr. Babcock wrote Dr. Williams after Smith's first visit and gave a tentative diagnosis of dysthemic disorder (which, in the past, was generally referred to as neurotic depression).  Based on her first visit, Dr. Babcock thought that Smith's depression and anxiety was work-related in part, but also stemmed from some personal issues.

the charged work environment, culminating with the calender incident, caused her physical and mental breakdown.

The second major incident of vandalism occurred after Smith returned to work.  On October 5, 2001, Smith observed the words "Kim Blows" on the wall of the Plant's elevator.[6]  Smith reported the incident to management and management had the words painted over.  However, the first time it was painted over, the words could still be seen, so after further complaints, another coat of darker paint was applied.  Exxon Mobil and the Union assert that an investigation ensued, although Smith contends that no further action was taken after the words were painted.  The responsible party was never found.

2.

Smith claims that employees would use foul and demeaning names of a sexual nature to refer to her.[7]  Relevant to this

---

(Dep. of Dr. Babcock, at pp.18-19.)
    Dr. Babcock indicated on June 26, 2001, that Smith was not able work, and requested that she be placed on leave until July 16, 2001.  (Dep. of Dr. Williams, Ex. W-2.)  Dr. Williams notified Turck and Thomas that Smith would be unable to work - even work with restriction - as per Dr. Babcock, until July 16, 2001.  (Dep. Of Dr. Williams, Ex. W-4.)  Dr. Pastore, Smith's primary care physician filled out a "Health Care Provider Report" on two occasions, July 24, 2001, and August 31, 2001, both of which indicated that Smith would be unable to return to work until September, 2001.

    [6] Exxon Mobil and the Union both assert that Spellman was the one who first observed the elevator graffiti. He immediately responded by painting over it.  Smith asserts that she saw it first and complained about it to Spellman.

    [7] The list of names included "slut," "cunt," "bitch," "trailer park Barbie," "trailer park trash" and "rail yard tooter."  Smith admits that she did not alert Plant management when she heard a co-worker refer to her as "trailer park Barbie."  She also admits that some of the other names were not heard by her directly, but rather she heard from someone else that people called her those names.

7

motion is the language used by Wagner, the Union's highest
ranking representative at the Plant.  Wagner has admitted to
referring to Smith using derogatory terminology, such as "bitch"
and "cunt," but offers a defense for his choice of vernacular.
He claims that his statements were made out of frustration,
because Smith's performance at work was suffering, she was not
following his advice to improve, and she was facing termination.
(Wagner Dep., at pp. 56-57; 60-61.)

Jonathan Walters, Esq, counsel to the Union, testified at
his deposition that Wagner referred to Smith as a bitch and a
cunt on two separate occasions.  Walters justified Wagner's
choice of words, by noting that Wagner's "style of speaking"
included referring to people, especially friends, in a derogatory
way. (Walters Dep., at p. 11.)  At some point before Smith was
fired, Walters recalled Wagner referring to her as a "cunt."
(*Id*. at 12.) Later, sometime in December, 2001 (around the time
Smith was fired), Wagner contacted Walters regarding potential
Union action on behalf of Smith and referred to Smith as a bitch
during a telephone conversation with Walters.  Walters recalled
Wagner saying "something like that bitch, I can't save the bitch,
she won't listen to me - - she didn't - - she didn't listen to
me."  (Walters Dep., at p. 11.)

John Hendricks, who is also a Union representative,
recounted at his deposition that Wagner made derogatory comments

8

about Smith, including that she was a "dumb bitch," while they were working on filing a grievance for her following her termination.  (Hendricks Dep., at p. 9.)

Gainer, one of Smith's supervisors in the period preceding her termination, recalled Wagner calling Smith a "bitch" and "trailer park trash" in a conversation with him.  (Gainer Dep., at p. 36.)  Gainer stated that the conversation took place after Smith returned from leave in September, 2001, but before she was fired in December, 2001. Gainer explained that the context of the conversation was Wagner telling Gainer that he was "upset" about the situation with Smith because he knew that she was going to be fired.  (*Id.*)

Clifford Patterson, a co-worker of Smith, recounted that Wagner called Smith a "dumb bitch" during a conversation he had with a few[8] of Smith's co-workers in the lunch room while Smith was out on medical leave.[9]  Patterson also recalled Wagner saying that he would feel bad when Smith lost her job, because he could not do anything to help her.  (Patterson Dep., at pp. 10-14.) (At the time Wagner made these comments, Smith was out on leave and the record indicates that there was no pending disciplinary

---

[8] Patterson named nine people, inlcuding himself, who were sitting at the table in the lunch room when Wagner addressed them and discussed Smith's situation.

[9] Patterson reported this incident to Peter McAllister in March, 2002, when he made a general complaint about the abusive language and harassing environment in the workplace. (Patterson Dep., at p. 37-38.)  Patterson also complained to John Thomas, the Plant Manager, and other people in management about the "abuse the girls take" over the course of a few months towards the end of 2001 and beginning of 2002.  (*Id.* at p. 39-40.)  Patterson did not report Wagner's comments to another Union official.

action against her.)  Wagner's commentary on Smith's situation was prompted by Dave DeSilva, a Plant employee, who inquired whether Smith complained to Turck about the calendar and wnet to the Plant's medical facility.  (*Id*. at p. 10.)

In addition, Patterson testified that Wagner also referred to Smith as a "dumb cunt" and "not all there upstairs" in front of him on an earlier occasion.  (*Id*. at p. 21.)

Clark Jordon, another co-worker of Smith, recalled Wagner speaking to him about how Smith was going to lose her job, because of her work performance and because she was not well-liked by management.  (Jordon Dep., at p. 41-42.)  In these conversations, Jordon stated that Wagner referred to Smith as a "slut" and "things of that nature."  (*Id*. at p. 41.)

3.

Smith also describes a number of other incidents which she asserts contributed to the sexually hostile work environment.[10] One such incident occurred on December 7, 2001, Plaintiff was required to work an overtime shift commonly referred as a "force" shift.[11]  This created an issue with Smith's childcare situation.

---

[10] The alleged harassment also included, among other things, co-workers questioning the ancestry of Smith's children and making comments about her physical attributes in a sexual manner.  In addition, Smith complains that pornography was regularly left in work and break areas.  She notes that the Union never made any effort to deal with the ever present pornography; she concedes, however, that she never filed an official complaint about the pornography, although she would bring the offensive material to management.

[11] Force shifts are a result of seniority and manpower shortages.  They require employees to work a sixteen (16) hour double shift.

Smith claims that she was teased by her co-workers, who knew that she faced a dilemma; one co-worker drew a hangman picture on the lunchroom dry erase board with the letters "F_RE_."[12]   Smith complained about the hangman drawing to her shift supervisor, Bob Robostello, who in turn informed Turck.   Two employees were interviewed in response; Exxon Mobil's position is that the "FRE" letters were a gender-neutral harassment directed at those employees, whether male or female, who were required to work the "force" shift.   Wagner attended a meeting with management regarding the hangman drawing.   (Wagner Dep., at p. 109.) The Union took no action and the employees who drew the hangman and "F_RE_" letters were never identified.

                                   B.

        Smith's retaliation claim to some degree is interwoven with her claim of a hostile work environment.   The following focuses on the events that transpired after Smith complained about the harassment, and can be viewed as both evidence of retaliation and evidence of a hostile work environment.

---

[12] If the hangman game was completed, the word "fired" could be spelled.  Wagner suggested in his deposition, that the completed word would be "forced."  (Wagner Dep., at pp. 109-10.)

1.

While Smith was out on medical leave, Turck, Thomas, McAllister and Charnisky began an investigation into aspects of Smith's claims of harassment and the compensable nature of her stress leave under Worker's Compensation, which was eventually denied.  At Thomas's request, Turck began compiling Smith's employment history, including a time line with specific references to her days off, her complaints of sexual harassment and several other disciplinary infractions.  In addition, Turck enlisted other managers to aid to the compilation.  It appears that through Turck other employees were made aware of Smith's work history and complaints.[13]  Wagner's role in developing the compilation is unclear; however, through discussions with Wagner, other employees learned more of Smith's complaints and heard that she was facing termination.

When Smith returned to work on September 18, 2001, she met with Turck and Wagner.  Turck informed her that his investigation did not reveal who had written the comments on the calender.  In addition, he advised her that she was to receive a final written

_____

[13] Turck sent an email to Charnisky, Thomas and McAllister on September 18, 2001, attaching a summary of the investigation of Smith's harassment claims.  McAllister responded to Turck: "You might want to contact John Charnisky and advise him that the Harassment part of this investigation is confidential and should not be passed along as he looks into the rest of the issues.  Best bet would be to have him delete the beginning of your report.  Concern here is the confidentiality we promise when we do these investigations on harassment.  It's a concern for her and the other employees named."  The beginning of the report was the investigation reports into Smith's harassment claim.  One of McAllister's main concerns was that Charnisky should not have access to those reports, especially because his job dealt with workman's compensation claims and not harassment claims.  (McAllister Dep., at pp. 102-03.)

warning with regard to her attendance.  If she were to miss one more day of work, she would be fired under the Attendance Policy ("Policy").[14]  Wagner did not object at any time during the meeting.

Smith alleges that she was incorrectly placed at the final stage of the Policy.[15]  Smith claims that the manner in which the Policy was applied to her, and the lack of objection from the Union, were forms of punishment, because she complained about the harassment.[16]  In the June 27, 2005, Opinion, this Court found that there was a material dispute of fact with regard to how the Policy was applied and how her absent days were calculated.

---

[14] The final written warning is the last step in Exxon Mobil's Policy, prior to termination.  The Policy provides for a progressive system of discipline that is initially triggered after four or more separate incidents of absence in a twelve-month period and it authorizes the following four steps of discipline: (1) counseling; (2) a written warning; (3) a final warning letter; and, (4) termination.  The Policy has discretionary "Forgiveness Factors" based on attendance improvement that allow for the reduction of a penalty and eventually removal from the disciplinary process.  Forgiveness factors apply at four, seven and twelve month intervals when the employee is without another incident of absenteeism.  For example, if an employee in the Policy's progressive disciplinary system works four months without another incident of absenteeism, his or her next absence will result in the same level of discipline previously received.  If an employee in the Policy's progressive disciplinary system works seven months without another incident of absenteeism, his or her next absence will result in the prior step of discipline than that last received.  If an employee works twelve months without another incident of absenteeism, the employee is removed from the Policy's disciplinary process.

[15] Smith contends that she was entitled to a forgiveness factor, which would in effect move her back a stage (away from termination) under the Policy.  In addition, she claims that half-days, sick days, and vacation days that should not be included as "absences" under the Policy, were considered by Turck in his application of the Policy to her.

[16] During the meeting, Smith asked why her leave was considered an absence and outside the Attendance Policy, as Workers' Compensation leave (stemming from workplace harassment).  Exxon Mobil's position appears to be that her emotional distress was not from workplace harassment, but other stress, and so it denied her Workman's Compensation claim.   (Dep. Of John G. Charnisky, at p. 33.) Had Plaintiff been approved for Workers' Compensation, her absence would not have been considered an absence under the Plant's Policy.  The record indicates that Wagner did not argue on her behalf that her leave was not an absence under the Policy.

2.

During the September 18, 2001 meeting, Smith learned that her schedule would change from a swing shift to a rotating shift. This change would have great ramifications for Smith's child care situation, and she felt that she was being singled out and transferred because of her complaints.[17]  Smith complained to Turck and found someone willing to trade shifts with her, but Turck was not receptive.  Wagner was present when Turck advised her of the shift change, and was aware of her efforts to go back to her prior shift.

3.

Working in her new shift, Smith was supervised by Gainer. Smith felt that management was closely watching her, especially Gainer, who she describes as "hawking" over her, following her to the bathroom, looking for her on short breaks and generally being more persistent and observant of her than other employees.

Smith complained about Gainer's conduct and Turck conducted an investigation.  Turck concluded that Gainer did not act inappropriately.[18]  According to Turck and Gainer, the "hawking"

---

[17] Smith was told that she was given a new schedule based on demand and seniority.  However, Gainer, her new supervisor, testified at his deposition that the he was told that Smith's shift changed so that one single supervisor would be responsible for her and able to closely monitor her (specifically her attendance and her work product). (Gainer Dep., at p.29.)

[18] McAllister was aware that Smith had made a complaint about Gainer, but he did not get involved. Turck conducted the investigation into Gainer's conduct alone. (McAllister Dep., at pp. 63-65.)  McAllister was also aware that Gainer had received counseling stemming from a different complaint by another female employee

14

was more a result of Gainer's management style and his dismay over the poor attendance record of Plaintiff.  It appears that Wagner was aware of Smith's problems with Gainer, and that Wagner had spoken to Gainer about Smith.[19]

### III.

#### A.

Smith's employment was terminated on December 19, 2001. Exxon Mobil and the Union contend that she was terminated for leaving work early, in violation of the Policy and against the verbal and written warnings of management.  Smith admits that she left work early on December 13, 2001, after she received an emergency phone call from her babysitter.  Smith, however, contends that she told her supervisor, Spellman, that her child was sick with a very high fever and she needed to go home. According to Smith, Spellman told her, "go do what you gotta to do," which she understood to mean that she had permission to leave her shift early.

Smith left, but did not call the Plant to let management know any further details.  She did not take her child to the doctor or the hospital, because, according to her, the child's fever had receded by the next morning.  Smith stated that she had

---

complaining of inappropriate conduct.  (*Id*. at 113-15, 140; *see also* Pl. Statement of Facts, ¶¶ 36-37.)

[19] The Union contends that the situation improved for Smith due in part because Wagner became involved.

contacted the doctor's office, and followed their instructions, but she did not submit any documentation to Exxon Mobil to prove her child was in fact sick.

At the Plant the next day, Spellman approached Smith and told her that Turck wanted to see her.  Turck and Wagner were present when Turck informed Plaintiff that because she left work without authorization, she would be sent home pending an investigation.  Turck showed Plaintiff an email from Spellman which stated that Plaintiff had left early the night before without permission.[20]

On December 19, 2001, Plaintiff met with Turck, Wagner and Thomas.  Wagner proposed that Plaintiff receive a 30 day suspension and/or be placed on probation.  (Wagner Dep., at pp.78-81.)  Both alternatives were declined and Smith was fired.

### B.

A grievance regarding Smith's termination was filed. In a letter dated December 20, 2001, Thomas informed Wagner that the grievance was denied, as he had found the termination was fair.

The CBA required the Union to consider arbitrating Smith's grievance.  In January 2002, the grievance came before the Union Negotiating Board (hereinafter "the Board").  Walters, the

---

[20] The general procedure followed at the Plant allows the supervisor to let an employee go home early under special circumstances.  According to Wagner, the fact that Smith was at the final warning stage meant that a special rule applied - zero tolerance for absenteeism.  (Wagner Dep., at pp. 73-74.)

Union's counsel, suggested that the matter be deferred in order to obtain more information about Smith's work history.  Since the Union had a fixed window in which it could request arbitration, it sought permission from Exxon Mobil for an extension of the deadline; Exxon Mobil agreed.

On February 26, 2002, the Union, through the Board, declined to proceed to arbitration.  The Board was comprised of five people who worked at a different facility.[21]  The Union is quick to note that no member of the Board had any interaction with Smith nor any knowledge of her sexual harassment complaint prior to the grievance over her termination being filed.[22]  According to the Union, the Board's decision was based only on the information provided at the meeting.

The Union contends that the Board considered Smith's work record, including her disciplinary history, her attendance record, as well as her explanation for why she left early on December 13, 2001.  In addition, the Board took into consideration Walters' opinion, as legal counsel to the Union.

---

[21] The five members worked at the Valero Refinery.  The employees of both facilities are members of the same Union, but the members do not have the opportunity to interact or work together.  Hendricks, an employee at the Plant, was supposed to vote, but was out sick at the time the Board voted on Smith's grievance.  (Wagner Dep., at p. 110.)

[22] Indeed, the Union president, Majewski, did not know of Smith's harassment complaints.  Smith stated that she met him for the first time the day of her third step of the grievance process.  (Pl. Opp'n at p. 7.)  Majewski testified that Wagner discussed Smith's grievance regarding her termination with him at the regular board meeting, prior to the third step of the grievance process.  Wagner provided Majewski with statistics on Smith's work history, such as days absent, days she left early, etc.  Wagner did not mention that forty of those days absent were due to medical leave, following the calender incident.  He also did not tell Majewski that Smith had brought harassment claims to management until after the grievance process.  (Majewski Dep., at pp. 19-21.)

Prior to the February 26, 2002 meeting, Walter had been asked by Wagner to prepare an opinion letter.  Walters offered his opinion at the meeting, stating that the likelihood of success in arbitrating the case on behalf of Plaintiff was too low to move forward.  In addition, during the Board's meeting, Wagner gave a short presentation on Smith's grievance; Smith was allowed the opportunity to comment, but declined.[23]

Wagner wrote Smith on March 1, 2002, and informed her that "after carful review of [her] disciplinary and attendance records"[24] and "based on Lube Plant rules and polices and recommendation from legal counsel," the Board withdrew her grievance.

---

[23] It was in conversations with Walters regarding preparation for the February meeting that Wagner used derogatory terms in reference to Smith.  There is no evidence, nor has Smith alleged, that Wagner used disparaging terms or discriminatory language during the presentation to the Board.

[24] Exxon Mobil makes little mention of Plaintiff's disciplinary record, making it appear that disciplinary issues outside her poor attendance were not factors in the decision to fire her.  The Union cites to a number of disciplinary problems characterized by Plaintiff as "minor."  On May 20, 1998, Plaintiff received a warning for not wearing safety glasses in a production area.  On December 29, 1998, she was suspended for two days (later reduced to one day after a grievance was filed from the Union) for violation of safety rules.  From May 11, through 13, 1999, she served a three days suspension because she filled up drums with the wrong product.  On October 16, 1999, she was given verbal coaching because she took three and a half hours to start a drum run.  On March 24, 2000, she was given a verbal coaching for leaving her work area without permission.  In April, 2001, she was given verbal counseling because she had used 24 reconditioned drums for a product which specifically required new drums.  Finally, on June 14, 2001, she was chastised, but not formally counseled, for an unexplained two hour absence from her work station.

As for Smith's attendance, she was given a number of warnings. On January 27, 2000, Plant Manager Thomas issued a warning letter to Smith regarding her attendance record from 1999.  Later that year, on October 13, 2000, Plaintiff received a second infraction, which resulted in her being placed under review and given a verbal counseling by her supervisor, Spellman.  On or about February 13, 2001, Plaintiff received a formal letter of warning from Operations Manager Turk.  The letter stated that Plaintiff had previously received verbal counseling and that her absences from January 3, through February 3, 2001, resulted in an interruption of service levels, increased cost and productivity levels.  It further stated that a continued pattern of excessive absenteeism would not be acceptable and without improvement in attendance, further disciplinary action, up to and including termination, may result.

C.

The Union points out that while it decided not to pursue Smith's grievance regarding her termination, it had pursued other grievances on her behalf.  On November 10, 1998, the Union filed a grievance challenging Exxon Mobil's decision to not allow Smith to work overtime on November 8, and November 10, 1998, because she had failed to bring a "return-to-work" slip.  This grievance was granted, and Smith was paid her reporting pay and given priority for an overtime assignment.  The next month, on December 29, 1998, Smith was suspended for two days; the Union filed a grievance and had the suspension reduced to one day.

The Union argues that when Smith first approached Wagner with claims of harassment, he acted quickly and worked with Exxon Mobil to investigate her claims.  Wagner was intricately involved with the processing of Smith's complaints, but at no time did the Union take action regarding Smith's claims of harassment.  The Union notes that Wagner argued for suspending Smith as an alternative to firing her, albeit unsuccessfully.  The Union contends that it historically defended Smith and its past practice is evidence that it did not act in bad faith when it chose to not pursue her termination grievance.

IV.

The test for summary judgement is stated in Rule 56 of the Federal Rules.  Summary judgement is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but. . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (citation omitted).

V.

A.

A union may be held liable when it breaches its duty of fair representation, or its duty to "serve the interest of all members without hostility or discrimination towards any, to exercise discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967) (citation omitted). The United State Supreme Court explains that "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190.

By settling a grievance prior to arbitration, a union does not per se breach its duty of fair representation; individual employees do not have "an absolute right to have [] grievances taken to arbitration." *Id.* at 191. Furthermore, a plaintiff will not prevail by merely showing that, in retrospect, the grievance had merit. *Bellesfield v. RCA Communications*, 675 F. Supp. 952, 956 (D.N.J. 1987). In addition, mistakes, negligence or poor judgment on the part of the union will not alone rise to the level of a breach. *Id.*

Instead, the key to a claim for breach of the duty of fair representation is the union's conduct. To succeed, the plaintiff must show the conduct was arbitrary, deceitful, dishonest or

21

based on bad-faith or fraud.  *See Amalgamated Assoc. of Street, Electrical Railway and Motor Coach Employees v. Lockridge,* 403 U.S. 274, 299 (1971).

B.

In the context of Title VII claims,[25] "to establish a prima facie claim against a union for breach of duty of fair representation, a plaintiff must show (1) the employer breached the collective bargaining agreement, (2) the union permitted the violation to go unrepaired, thereby breaching the duty of fair representation, and (3) there was some indication that the union's actions were motivated by discriminatory animus." *Webb v. Merck & Co.*, No. 99-413, 1999 WL 387122, at *3 (E.D.Pa. 1999) (citing *York v. American Tel. & Telegraph*, 95 F.3d 948, 955-56 (10th Cir. 1996); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 868 (7th Cir. 1985)).

In support of her claims asserted in Count V of the Complaint, Smith cites four relevant portions of the CBA: (1) Article II guarantees that there will be no discrimination based upon sex; (2) Article VII requires that all discharge and disciplinary action be for just cause; (3) Article XIII outlines the grievance procedure for disputes under the contract; and (4) Article XIV describes the process for initiating arbitration.

---

[25] The parties agree that this standard applies in the instant matter.

Smith alleges that Exxon Mobil violated the CBA, specifically Articles II and VII, because it maintained a sexually hostile work environment and terminated her employment, among other adverse actions, in retaliation for her complaints regarding workplace sexual harassment.  Smith further alleges that the Union's non-compliance with its own procedures set forth in Articles XIII and XIV is evidence that it breached its duty of fair representation.

1.

Smith has alleged that Exxon Mobil breached the CBA by engaging in discriminatory and retaliatory conduct based on her sex.  The CBA specifically prohibits discrimination based on sex; it also requires that all disciplinary action, including termination, be based on just cause.  In the June 27, 2005, Opinion, this Court found that Smith provided sufficient evidence for her NJ LAD claims of hostile work environment and retaliation against Exxon Mobil to survive summary judgement.  Based on the reasons set forth in the June 27, 2005, Opinion, we find that Smith has raised a triable issue of fact as to whether Exxon Mobil breached its obligations under the CBA.  A reasonable fact finder could conclude that Smith's co-workers and supervisors at Exxon Mobil engaged in discriminatory conduct and/or did not take appropriate action once discriminatory conduct was discovered.

23

Smith has also raised an issue of fact regarding the application of Exxon Mobil's Attendance Policy and the number of days that she was "absent" from work.  In the June 27, 2005, Opinion, we found that the evidence could allow a reasonable trier of fact to conclude Smith's absenteeism was merely a pretext for firing her.  Smith's claim against Exxon Mobil that she was fired in retaliation, and not for just cause as required by Article VII of the CBA, survived summary judgement and presents a triable issue of fact as to the existence of a breach of the CBA.

2.

The Union argues first that there were no violations of the CBA, and second that even if there had been a breach of the CBA, it did not allow it to go "unrepaired."  As Smith has raised triable issues of fact as to whether the CBA was breached, we will address the Union's contention that it worked diligently to protect Smith's job and address the alleged violations of the CBA.

In *Vaca*, the Supreme Court overturned a jury award against a union for a breach of the duty to fair representation because the union had taken multiple, significant steps to protect the union member, namely the union "processed the grievance into the fourth step, attempted to secure for Owens [the plaintiff] less vigorous

24

work at the plant, and joined in the employer's efforts to have Owens rehabilitated. . . . There is no evidence that any Union officer was personally hostile to Owens or that the Union acted at any time other than in good faith."  386 U.S. at 194.

Here there is evidence that the Union took some steps to assist Smith.  However, a reasonable fact finder could conclude that the Union failed to take the more important or significant steps.  While the Union, through Wagner, brought certain incidents of sexual harassment to the management's attention and participated in discussions with management, it failed to address many of the underlying causes of the hostile work environment, including, perhaps most importantly, Wagner himself.[26]

Furthermore, Smith has raised a triable issue of fact as to whether the Union allowed the alleged retaliation, which she claims includes her termination, to go unrepaired.  Like in *Vaca*, the Union took the grievance to the step preceding arbitration.[27]

---

[26] Majewski responded with vague answers and eventually said "No" in his deposition when asked if the Union would have taken action if it knew with certainty that Wagner used terms such as "bitch" and "cunt" when referring to Union members.  (Majewski Dep., at pp. 23-24.)  Majewski also stated that he did not have a sex discrimination policy in place.  (*Id*. at p. 24.)

Smith also points out that the Union never addressed the "rampant" display of pornography.  In addition, Smith argues that the Union did not follow up with any of Smith's sexual harassment claims through the grievance or arbitration procedures, but rather accepted Turck's assurances that no culprit could be uncovered and that the posting of the sexual harassment policy was a sufficient remedy.

[27] The Union also argues that it took the step of trying to negotiate an agreement prior to Smith's termination whereby she would be suspended without pay instead of fired.  It, however, does not argue that it took any affirmative steps to protect Smith's job while she was on leave or after she returned and was given a final warning.  Indeed, during the time Smith was on leave, but prior to her being issued a final warning for attendance, Wagner repeatedly spoke about her to other employees in a derogatory manner and stated that she would likely lose her job.

In contrast to the facts of *Vaca,* there is evidence in the instant record that a Union officer, Wagner, was "personally hostile" to Smith.  The deposition testimony shows that Wagner made derogatory comments about Smith not only to her co-workers, but to Walters, the individual who would conclude that the likelihood of success was low and recommend to the Board that Smith's grievance not be pursued to arbitration, and to Hendricks, who was supposed to vote with the Board on Smith's grievance.  While hostility alone would not constitute a breach of the duty of fair representation, Wagner's openly hostile attitude toward Smith, coupled with Smith's other evidence that the Union condoned the management's retaliatory response to Smith's complaints, would allow a reasonable trier of fact to conclude that the Union allowed retaliatory conduct, including her termination, to go unrepaired.

3.

Finally, in order for Smith's breach of duty of representation claim to survive summary judgement, she must show that there is a triable issue of fact as to whether the Union was motivated by discriminatory animus.  Smith cites to the conduct of Wagner, the Union's highest ranking official at the Plant, as evidence that the Union decisions were motivated by discriminatory animus.

26

The Union contends that Wagner, while engaging in "regretful" behavior, did not have the decision making authority to approve arbitration for Smith's grievance.  The Union points out that the Board made the decision not to arbitrate, and was a neutral body which had no prior interaction with Smith.

Smith counters that while Wagner did not have official decision making authority, he did play an influential role in the Board's decision.  Smith points out that it was Wagner who presented her grievance to the Board, which had neither prior knowledge nor experience with the Plant.  Smith also suggests that Wagner worked closely with Walters to secure his opinion. At no time did Wagner take Smith's sexual harassment claims to the Union.[28]

Based on Wagner's presentation and Walters' opinion, the independent board made its decision.[29]  Thus, Smith argues, Wagner's actions should be imputed to the Board as its decision was laced with the discriminatory animus of Wagner.[30]

A reasonable fact finder could hold that the Union's

---

[28] The casual manner in which Wagner is alleged to have shared personal information about Smith regarding her sexual harassment complaints with other employees could lead a reasonable fact finder to agree with Smith's proposition that Wagner, and thus the Union, did not treat Smith's complaints seriously.

[29] The Court notes that this is not a case where the employee was uniquely situated to supply the Union with evidence of the merit of her claim; indeed, the Union's own argument is that Wagner was intricately involved with Smith's claims of sexual harassment and retaliation.  Wagner also was involved with management meetings regarding the application of the Attendance Policy.  Wagner was in a prime position to report the harassment claims to the Union, but chose to only discuss the reasons given by Exxon Mobil for terminating Smith.

[30] Smith argues that Walter's opinion was also tainted by discriminatory animus, because Wagner referred to Smith as a cunt and bitch when requesting Walter's opinion as to whether or not to proceed to arbitration.

decision to not arbitrate was motivated by discriminatory animus.
Smith has raised a triable issue of fact as to whether the
decision not to arbitrate was based on factors besides the
potential merit of her claim. *Cf. King v. Fox Grocery Corp.,* 642
F. Supp. 288, 290 (W.D.Pa. 1986) (finding that while not
conclusive, the fact that the Union acted outside normal channels
during the grievance process in somewhat of a suspicious manner
mandated that judgement was inappropriate at that time).


                                VI.

     Smith has also asserted claims of Intentional Infliction of
Emotional Distress ("IIED") and Negligent Infliction of Emotional
Distress ("NIED") against the Union.  The IIED claim against the
Union will be dismissed, but the NIED claim will survive summary
judgement.


                                A.

     A claim for IIED requires a showing "(1) that the defendant
acted intentionally or recklessly, both in doing the act and in
producing emotional distress; (2) that the defendant's conduct
was so outrageous in character and extreme in degree as to go
beyond all bounds of decency; (3) that the defendant's actions
were the proximate cause of the emotional distress; and (4) that
the emotional distress suffered was so severe that no reasonable

                                28

person could be expected to endure it." *Wigginton v. Servidio*, 324 N.J. Super. 114, 130 (App. Div. 1999).

Determining the intent of the defendant is a question for the fact finder. *Id.* at 131. In cases where the defendant allegedly spoke in such a way as to create a hostile work environment, the intent of the defendant can be inferred from the remarks themselves. *Id.*

Assuming Wagner's remarks could be imputed to the Union for the purpose of holding the Union liable for a claim of IIED, and a reasonable fact finder determined that the remarks were made recklessly or intentionally, Smith's claim will still fail.

Smith has not demonstrated that Wagner's conduct, or the conduct of another Union representative, was so extreme or outrageous as to exceed the bounds of decency.[31] *Wigginton*, 324 N.J. Super. at 130. Summary judgement will be granted in favor

---

[31] In the June 27, 2005, Opinion, Smith's IIED claim against Exxon Mobil survived summary judgement. Exxon Mobil had admitted that its employees defaced a work calender and graffitied "Kim Blows" in a common area. It also did not deny that pornographic materials were left in work areas, where Smith found them, nor did it deny that Smith was subject to name calling. In addition, Smith provided evidence that would allow a reasonable trier of fact to find that Exxon Mobil's response to her complaints was inadequate. Thus, we concluded that Smith had raised a material issue of fact as to the extremity of the conduct.

Smith's allegations against the Union, however, just miss the mark. She has alleged that the Union actively participated in only some of the above-mentioned situations. The gravamen of her complaint against the Union is the Union "participate[d] in maintaining the hostile work environment . . . and fail[ed] to enforce the collective bargaining agreement's sex discrimination provisions." (Pl. Response, at p. 30.) Smith has not, however, alleged that the Union was directly involved in the pornography, the defacing of the work calendar or the "Kim Blows" graffiti, until after she brought her complaints to the attention of Exxon Mobil's management; at that point, she alleges the Union failed to adequately address her complaints. While a reasonable fact finder could conclude that the Union's conduct was reprehensible, went against public policy, and was in violation of the law, Smith has not provided sufficient evidence for a reasonable fact finder to conclude that the Union's behavior or its sanctioning of Exxon Mobil's discrimination and inaction was so extreme or outrageous as to exceed the bounds of decency.

of the Union as to Smith's claim for IIED.[32]

B.

To assert a viable cause of action for NIED against the Union, Smith must show that (1) the Union had a duty; (2) the Union owed the duty toward Smith; (3) the Union breached that duty, proximately causing Smith's injury of genuine and substantial emotional distress. *Lascurain v. City of Newark*, 349 N.J. Super. 251, 277 (App. Div. 2002).

At the very least, the Union owed a duty to Smith pursuant to the CBA to address any violations of the CBA on Exxon Mobil's part and to fairly represent her through the grievance process. The Union contends that there is no evidence of genuine and substantial emotional distress, and, if emotional distress is found present, the Union's failure to represent Smith is not the proximate cause of her distress.

Smith has provided evidence that the emotional distress she suffered was "genuine and substantial." Smith took leave for

---

[32] Because we find that Smith's claim for IIED against the Union fails on the merits, we will not address the Union's succinct argument that her IIED claim is pre-empted by the National Labor Relations Act ("NLRA"). In *Farmer v. United Brotherhood of Carpenters and Joiners*, 430 U.S. 290, 297 (1976), the Supreme Court noted that the general rule provides that state jurisdiction must defer to the NLRA in situations where the state attempts to regulate activities protected under Section 7 of the NLRA or activities constituting unfair labor practices under Section 8 of the NLRA. However, the Court held that state jurisdiction will not be preempted if the activity is either a "peripheral concern" of the federal legislation or if it "touches interests so deeply rooted in local feeling that, in the absence of compelling congressional direction, [the Court] could not infer that Congress had deprived the States of the power to act." *Id.* The question of whether IIED claims are preempted has been answered differently by courts outside this circuit. *See Viestenz v. Fleming Companies, Inc.*, 681 F.2d 699 (10th Cir. 1982) (upholding claim under state law for IIED and finding preemption was not appropriate); *Anspach v. Tompkins Industries, Inc.*, 817 F. Supp. 1499, 1514 (D. Kansas 1993) (finding that plaintiffs' state law claims for IIED were preempted by federal law).

30

almost sixty days following the calender incident.  Upon her return, she was seen as physically and emotionally shaken following the subsequent incidents of alleged harassment, specifically after seeing the hangman drawing and the "Kim Blows" graffiti.  Furthermore, after filing the instant law suit, Smith was seen by a psychiatrist who found that she "show[ed] evidence of having post traumatic stress disorder from her perception of what happened at Mobil Oil.  She continues to have anxiety, flashbacks and bad dreams concerning how she was treated there. These problems need to be addressed." (Pl. Opp'n, Ex. O.)

To what degree Smith's distress was caused by the Union and not Exxon Mobil is unclear.  However, a reasonable trier of fact could find that the Union did contribute to Smith's distress, by not taking action to repair the hostile work environment, and furthermore by contributing to it.  In addition, because Smith has raised triable issues of fact as to her breach of duty of fair representation, a reasonable trier of fact could find that the Union's failure to pursue Smith's grievance caused her emotional distress.

Smith has shown that the Union owed a duty and that she suffered emotional distress.  She also has raised a material issue of fact as to the role the Union played in causing her emotional distress.  Therefore, summary judgement will be denied as to her claim of NIED against the Union.

VII.

Smith has asserted claims under the NJ LAD against the Union, specifically for hostile work environment and retaliation.

A.

To establish a prima facie case under LAD for a hostile work environment, Smith must show that the alleged conduct "(1) would not have occurred *but for* the employee's gender; and it was (2) *severe or pervasive* enough to make a (3) *reasonable woman* believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive*." *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 603-04 (1993).  The conduct for which Smith claims the Union should be held liable is that of Wagner and other Union employees.

1.

Smith must first demonstrate that the above-describe *Lehmann* test is applicable to the Union.  In *Baliko v. Stecker*, the New Jersey Appellate Court found that labor organizations could be held liable under LAD, as per the standards set forth in *Lehmann* if a trier of fact could "find that conduct was authorized, sanctioned, or ratified by the local, either expressly or implicitly."  275 N.J. Super. 182, 191 (App. Div. 1994).  In *Baliko*, the plaintiffs were two female employees who were subject

32

to lewd and derogatory shouting on a daily basis from union members on a union organized picket line near the entrance to the workplace.

The Appellate Court further noted that labor organizations act only through their agents.  "If one member assists, supports, encourages, and supplements the efforts of another in conduct which violates the LAD, the local may be liable as a principal for violating N.J.S.A. 10:5-12b and individual members may be liable as aiders and abettors."  *Id.* (referring to the portion of the NJ LAD covering unlawful employment practices which explicitly states that unions may be held liable).

The Third Circuit has recognized that NJ LAD or Title VII claims may be applied to a union.  However, such a claim against a union will not survive summary judgement in cases where some of the alleged harassers were union members, but there is no evidence in the record "that the Union *itself* instigated or actively supported the discriminatory acts allegedly experienced."  *Anjelino v. The New York Times Company*, 200 F.3d 73, 95 (3d Cir. 2000).  In *Anjelino*, the Third Circuit found that the employer, not the Union, was the responsible party for assigning work and ensuring that the workplace was not "contaminated" with discrimination.  *Id*. at 96.

While the conduct of the Union, through its members, namely Wagner, is the type of conduct which a reasonable jury could

33

conclude was "authorized, sanctioned, or ratified by the local, either expressly or implicitly." *Balinko*, 275 N.J. Super. at 191.  Wagner's conduct, and the actions of other union members, were not performed in the context of a union organized and sanctioned picket line.  Still, Wagner's high ranking status and his continued use of derogatory language when referring to Smith in front of other Union officials and her co-workers could be interpreted by a reasonable fact finder to amount to Union sanctioned conduct.  In addition, a reasonable fact finder could interpret Wagner's status in the Union and his involved role in the management's "investigations" (which Smith contends were perfunctory if they occurred at all) as evidence of the Union's implicit sanctioning or authorization of a hostile work environment at the Plant.  Finally, Majewski's testimony regarding he lack of a sex discrimination policy within the Union and his admission that Wagner would not have been reprimanded for using terms like "cunt" and "bitch" could lead a reasonable fact finder to conclude that the Lehmann test is applicable to the Union.

2.

The terms Wagner used when discussing Smith with other employees and the Union's counsel, namely "bitch" and "cunt," are

terms used to describe females.[33]  The Union contends, as Exxon Mobil did in its Motion for Summary Judgement, that the comments made about Smith were gender-neutral.  Furthermore, the Union argues that Wagner spoke out of frustration, and not in a sexual manner.

Viewing the facts in a light most favorable to the Plaintiff, we do not accept the Union's contention that the alleged harassment was not based on Smith's gender.  Smith has provided evidence, through deposition testimony, that Wagner repeatedly singled her out, made reference to her as a woman and spoke in a derogatory manner in front of her co-workers and Union counsel, using sexual language that makes specific reference to gender.

Wagner's self-serving justification for his language - that he demeaned and degraded Smith in front of various people in an effort to "help" her and out of frustration because he felt she put herself in a position where he could not help her - does not automatically absolve the Union of any potential liability.  While Walters' testimony suggests that Wagner generally used crude terminology, we find that the context of Wagner's commentary on Smith is further evidence that Wagner was making

---

[33] The noun "bitch" is defined as "the female of the dog" or "the female of other certain carnivorous mammals."  It is further defined as "a lewd or immoral woman."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 222 (1993).   The term "cunt" describes female pudenda, or the female external genital organ.  *Id*. at 554.  It is also defined as "a woman regarded as a sexual object." *Id*.  The definition notes that the term "cunt" is usually considered "obscene."  *Id.*

those comments based on Smith's sex, and would not be making such comments if she were a man.  In most of the incidents, Wagner's commentary on Smith was unsolicited.  To the extent that he was asked about Smith's status, Wagner went far beyond explaining his perceived predicament as a faithful union representative; Wagner provided personal evaluations of Smith, predictions for her termination and throughout, used extremely negative and demeaning sexual terms to refer to Smith.

3.

A single comment may be sufficient to establish a hostile work environment in extreme cases.  However, a series of lesser incidents that alone would not be sufficient may be viewed together to establish a hostile work environment.  *See Baliko*, 275 N.J. Super. at 189 (citing *Lehmann*, 132 N.J. at 606-07).

Without ruling on the merits of Smith's case, we find that her complaint that Wagner engaged in a campaign of name calling and demeaning conduct towards her,[34] along with her general complaints that other Union members harassed her, allege behavior that is sufficiently severe and pervasive to survive summary

---

[34] We note that Smith's complaints about Wagner go beyond mere name calling.  She alleges that confidential and personal information, which she shared only with Turck and Wagner, was leaked to her co-workers. A reasonable fact finder could believe the testimony that Wagner repeatedly discussed Smith's situation with co-workers, and infer that he might have leaked sensitive information; such a conclusion would support a finding that the harassment was severe and pervasive.  In addition, while Smith does not expand on it in her responsive papers, the Court notes that she complained to Gainer during her employment that Wagner had inappropriately touched and spoken to her, with reference to her complaints about the calender incident.  *See supra* note 3.  The record indicates that Smith was left mentally and physically disturbed by these incidents.

judgement.

4.

For the reasons explained above and for the reasons provided in the June 27, 2005, Opinion, Smith has raised a material dispute of fact as to whether a reasonable woman would believe that the conditions of employment were altered and that a hostile or abusive working environment existed.

Summary judgement will be denied as to Smith's claim that the Union violated the NJ LAD, set forth in Count I of the Complaint.

B.

Smith's Complaint alleges a claim for retaliation against both Exxon Mobil and the Union, and the facts presented by Smith appear to allege that at the very least Wagner, if not other Union members, took action against her after she filed complaints about the alleged sexual harassment.  However, Smith does not specifically address the retaliation claim against the Union in her responsive papers.

Summary judgement will be granted in favor of the Union to the extent Count II alleges a cause of action against the Union. We note that the claims against Exxon Mobil asserted in Count II survived summary judgement.  (June 27, 2005, Opinion.)

37

VIII.

For the reasons set forth above, the Court will grant in part and deny in part Defendant Independent Oil Workers at Paulsboro's Motion for Summary Judgement.  Smith's claim for intentional infliction of emotional distress, Count III of the Complaint, will be dismissed in favor of the Union.  In addition, to the extent Smith asserts a claim in Count II of the Complaint against the Union, summary judgement will be granted in favor of the Union.  However, the remaining claim under NJ LAD for hostile work environment, Count I, will survive the Union's motion.  In addition, summary judgement will be denied as to Smith's claims in Count IV for negligent infliction of emotional distress and in Count V for breach.  The Court will issue an appropriate Order.

Date:   7/19/05

s/Joseph E. Irenas
Joseph E. Irenas, S.U.S.D.J.